## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

CRISTOBAL ANTONIO MANCIA
ADC #141255                                                                    PETITIONER

v.                              No. 5:16cv00001-JTR

WENDY KELLEY, Director,
Arkansas Department of Correction                              RESPONDENT

## MEMORANDUM AND ORDER

Pending before the Court[1] is a 28 U.S.C. § 2254 Petition for Writ of Habeas

Corpus filed by Cristobal Antonio Mancia ("Mr. Mancia"), an inmate in the

Arkansas Department of Correction ("ADC"). *Doc. 1*. Before addressing the merits

of Mr. Mancia's habeas claims, the Court will review the relevant underlying facts

and the procedural history of the case in state court.

## I. Background

On May 13, 2007, Jason Beeler, a Bentonville police officer ("Officer

Beeler"), responded to a call from a residence where "a juvenile [was] being

inappropriately touched by her father." *See* Affidavit of Sergeant Justin Thompson

("Sgt. Thompson"), *Doc. 7-14 at 11*. At the residence, Officer Beeler spoke with

---

[1] The parties have consented in writing to proceed before a United States Magistrate Judge. *Doc. 9.*

Merary Valle, the aunt of the victim, "E.M." *Id.* Ms. Valle reported that she called 911 because E.M. "had been touched in a 'bad way' by her step-father, Cristobal Mancia." *Id.* Ms. Valle told Officer Beeler "she had overheard [E.M.] talking to her mother [Mirna Mancia] about her dad [Mr. Mancia] touching her again." *Id.* Ms. Valle asked E.M. what had happened, and E.M. said Mr. Mancia "spits on his fingers and touches her privates," and touches her with his penis. *Id.* E.M. also told Ms. Valle that Mr. Mancia threatened to hit her if she told anyone. *Id.*

Ms. Valle, who was fluent in Spanish and English, then served as an interpreter for Officer Beeler in his interview of E.M. and her mother, Mirna Mancia ("Ms. Mancia"), neither of whom spoke English. *Id.*[2] Using a doll, Officer Beeler asked E.M. to point to the areas of the doll where Mr. Mancia had touched her. *Id. at 12.* E.M. pointed between the legs of the doll and indicated Mr. Mancia had placed his fingers and penis inside of her. *Id.* Finally, E.M. told Officer Beeler that Mr. Mancia had touched her inappropriately "many times" and that this touching had occurred about one month earlier, in April 2007. *Id.*

Officer Beeler then interviewed Ms. Mancia, and again used Ms. Valle as his interpreter. *Id.* Ms. Mancia stated that, about seven months ago, E.M. told her that

---

[2] At the time of their interview, Ms. Mancia and E.M. had been in the United States for approximately eighteen months. *Doc. 33-1 at 11.* In contrast, Mr. Mancia had been in the United States for fourteen years. *Doc. 7-14 at 81-82.*

Mr. Mancia touched her "private parts." *Id.* She confronted Mr. Mancia, who got "very angry" and denied inappropriately touching E.M. *Id.* Ms. Mancia reported "she was very suspicious" and told Mr. Mancia "to never touch her [E.M.] there again." *Id.* Finally, Ms. Mancia indicated her husband was "violent with her" and she was "scared of how he would react if he knew the police had been called." *Id.*

Officer Beeler took Ms. Valle, Ms. Mancia, and E.M. to the Bentonville Police Department, apparently because they did not want to be at the residence with Officer Beeler when Mr. Mancia returned home. *Id.* After Officer Beeler informed Sgt. Thompson of the results of the interviews, Sgt. Thompson decided to arrest Mr. Mancia. *Id. at 13.* A short time later, officers went to Mr. Mancia's home, placed him under arrest, and transported him to the Bentonville Police Department. *Id.*

At approximately 6:00 p.m. on May 13, 2007, Sgt. Thompson and Officer Beeler interviewed Mr. Mancia about his sexual contact with E.M. A transcribed copy of that interview has now been made a part of the record in this case. *Doc. 33-1.*[3]

Sgt. Thompson and Officer Beeler knew that English was Mr. Mancia's

---

[3] On September 12, 2018, the Court entered an Order (*Doc. 30*) directing Respondent to locate the transcript of this interview and make it part of the record in this case. On October 10, 2018, Respondent filed a Notice of Filing (*Doc. 33*), which attached a copy of the transcript of Mr. Mancia's post-*Miranda* interview with Sgt. Thompson and Officer Beeler (*Doc. 33-1*).

second language, and they were careful to make sure Mr. Mancia understood his *Miranda* rights before they began asking him questions. *Id. at 1-7*. Mr. Mancia verbally acknowledged that he understood each of his *Miranda* rights, and then signed and initialed a *Miranda* rights form that explained his *Miranda* rights in both English and Spanish. *Id*. Finally, Mr. Mancia told Sgt. Thompson he was willing to talk because "I don't have anything to hide." *Id. at 6*.

During the interview, Mr. Mancia gave responsive answers to the officers' questions in imperfect but understandable English. *Id. at 7-69*. He answered all of the officers' questions and sometimes gave multi-sentence responses. Based on the transcript of this interview, it is clear that Mr. Mancia had a good understanding of spoken English and could speak English fairly well. Mr. Mancia's ability to understand and speak English, throughout this lengthy interrogation, *seriously undermines* his post-conviction claims that his lack of proficiency in English prevented him from making a knowing and voluntary guilty plea.[4]

---

[4] About one month after Mr. Mancia pled guilty, he was interviewed by Michael Markum, a Benton County "Probation/Parole Officer," who was responsible for preparing a Pre-Sentence Report. *Doc. 7-14 at 81-90*. Mr. Markum reported that Mr. Mancia was born in El Salvador, on January 16, 1973, and attended only two years of school before his father "put him to work in the fields of their farm." *Id. at 82*. Mr. Mancia came to the United States at the age of twenty, which meant he arrived some time between January 16, 1993 and January 15, 1994. *Id*. He began working for Wal-Mart in Bentonville in 1997, "performing maintenance for their truck fleet." *Id*. According to Mr. Markum, "this was a very good job for him that paid him well" and he continued to hold that job through the time of his arrest on May 13, 2007. *Id*.

Mr. Markum described Mr. Mancia as "not read[ing] much [English] but his command of English is fair." *Id*. Later in his report, Mr. Markum stated that Mr. Mancia's "command of spoken

Mr. Mancia initially denied having any sexual contact with E.M. *Id. at 23-24*. When Sgt. Thompson confronted him with the sexual abuse allegations made by E.M., Ms. Valle, and Ms. Mancia, Mr. Mancia responded: "That's what they say? Did they have proof? Did they see?" *Id. at 20*. As the questioning continued, Mr. Mancia gradually began to admit that he had sexually abused E.M.:

> OFFICER BEELER: Did you touch her, with her vagina with your penis?
>
> MR. MANCIA: I don't know, sir.
>
> OFFICER BEELER: You don't know? You did, didn't you? Cris? Look at me.
>
> MR. MANCIA: Ahm, maybe, you know. . . . Maybe men do stuff, sir. . . . Well . . . To get it out of your mind.
>
> * * *
>
> MR. MANCIA: "It might be one of those days when you havin' a bad day. And you drinkin', you know[.]"

---

English is quite good." *Id. at 86*. The Court construes Mr. Markum's assessment of Mr. Mancia's proficiency in English to mean: he could not read much English; he had a "fair" ability to speak English; and he had a "quite good" understanding of spoken English.

At the time of his arrest, Mr. Mancia had been living in the United States for fourteen years and had been working for Wal-Mart for ten years. *Id. at 82*. This was more than enough time for Mr. Mancia to develop a fair to good command of the English language. During his interview with Sgt. Thompson and Officer Beeler, Mr. Mancia stated that "All my friends are white guys", which is further support for his ability to understand and speak English well enough to converse in that language. *Doc. 33-1 at 60*. Finally, Mr. Mancia did not request an interpreter or otherwise indicate he was having any difficulty understanding and responding to the questions that he was asked in English during his lengthy interrogation by Sgt. Thompson and Officer Beeler and his later interview with Mr. Markum.

*Id. at 37-38.*

Mr. Mancia went on to admit that "probably three times" he had rubbed his penis against E.M.'s vagina and penetrated her about ¼ inch:

> OFFICER BEELER: How much can you get inside of her?
> . . . An inch? A half an inch?
>
> * * *
>
> MR. MANCIA: I don't know, but let's say quarter.
>
> OFFICER BEELER: A quarter of an inch . . .
>
> MR. MANCIA: Yeah.
>
> OFFICER BEELER: . . .gets into her.
>
> MR. MANCIA: Yeah.

*Id. at 50-51.*

Mr. Mancia also admitted that he had touched E.M.'s vagina with his fingers about nine times:

> OFFICER BEELER: . . . I'm talking about sexually touchin' her with your fingers. How many times in the last seven months have you touched her sexually with just your fingers[?]
>
> MR. MANCIA: Probably maybe nine times, maybe. You know?

*Id. at 56.*

Finally, Mr. Mancia characterized his sexual contact with E.M. as "nothing

6

serious with the little girl[,]" and stated that he stopped short of full penetration because he didn't want to "molest the kid." *Id. at 51-52*. He also blamed E.M. for "flirtin'" with him (*Id. at 43*), and jumping on top of him and rubbing him, which caused him to "get an erection." *Id. at 45*.

These extremely troubling statements by Mr. Mancia, who attempted to normalize his sexual interactions with a six-year-old child, strongly suggest that, if given the opportunity, he would engage in the same kind of conduct again.[5] By making these statements, Mr. Mancia *greatly reduced* the chances that the prosecutor might later offer him a plea agreement, and *greatly increased* the chances that, if a jury later convicted him of rape, he would receive the maximum sentence of "life."

On May 21, 2007, Mr. Mancia was charged in a criminal information with one count of rape, under Ark. Code Ann. § 5-4-103(a)(3)(A). This statute makes it a Class Y felony for a person to "engage[] in sexual intercourse or deviate sexual activity with another person ... [w]ho is less than fourteen (14) years of age." *Doc. 7-14 at 6-7*.

Mr. Mancia hired Bruce Bennett ("Mr. Bennett"), an attorney in Bentonville,

---

[5] In the Pre-Sentence Report, Mr. Markum characterized Mr. Mancia as a "non-exclusive pedophile . . . who may be normally involved with an adult, heterosexual relationship, but who devolves into a deviant, sexual pattern of behavior when certain circumstances fall upon the offender." *Doc. 7-14 at 86*.

Arkansas, to represent him. *See* Motion for Reduction of Bond, *Doc. 7-14 at 19*; Docket Sheet, *Id. at 100*. His jury trial, originally scheduled for September 11, 2007, was later continued because Ms. Mancia and E.M. had moved to New Jersey and could not be located in time to appear on that date. *Id.*; Motion for Continuance, *Id. at 36*. The case was reset for December 11, 2007, but continued a second time to February 5, 2008.[6] *Id. at 100*.

At 8:30 a.m. on Monday, February 4, 2008, the day before his jury trial was scheduled to begin, Mr. Mancia appeared in court for a pretrial hearing.[7] *Id. at 105-122*. During this hearing, Mr. Mancia and two other defendants, *in unrelated cases*, all entered guilty pleas.

Nothing in the record establishes precisely when Mr. Mancia decided to enter a guilty plea. However, the transcript of the plea colloquy makes it clear that, *some time before the hearing began*, on February 4, 2008, Mr. Mancia signed an "*Agreed Statement of Facts*."[8]  In that document, Mr. Mancia admitted to the following:

> On various dates in 2006 thru May 2007, the Defendant

---

[6] The record does not indicate the reason for the second continuance.

[7] The docket entry on February 4, 2008, states "DEF W/BBENNETT FOR PT[.]" *Doc. 7-14 at 101*. "PT" appears to be an abbreviation for "pretrial hearing", which normally would be scheduled the day before or on the morning of the trial.

[8] This document is also signed by Mr. Bennett and Benton County Chief Deputy Prosecutor Shane Wilkinson.

> engaged in deviate sexual activity and sexual intercourse
> with E.M., who was 5 and 6 years old at the time. More
> specifically, he penetrated her vagina with his fingers and
> penis. E.M. is the Defendant's adopted daughter.

*Id. at 76*. This document almost certainly was drafted, reviewed, and agreed to, on

or before February 3, 2008, so that it could be signed and introduced into evidence

during the 8:30 a.m. hearing on February 4.[9]

Before the pretrial hearing began on February 4, 2008, Mr. Mancia and Mr.

Bennett also signed a form document entitled "Defendant's Statement."*Id. at 74-75*.

Paragraph 7 of that document contained a *potentially serious error* regarding the

length of the minimum sentence Mr. Mancia faced for the offense charged in the

Information:

> My attorney informed me that the punishment which the
> law provided for the offense/offenses charged in the
> Information is: imprisonment from 10 to 40/life years . . .
> for the Class Y [felony] charged in the Information[.]

*Id. at 74*. In fact, the range of punishment for rape of a person less than fourteen

---

[9] In his habeas Petition, Mr. Mancia alleges that Mr. Bennett showed up drunk at the Benton County Jail and Detention Center, at 2:00 a.m. on the morning of February 4, 2008 (six and one half hours before he entered his guilty plea), to persuade him to plead guilty. *Doc. 1 at 4*. On its face, this story seems very implausible, especially since: (1) only six hours after a drunk Mr. Bennett allegedly convinced Mr. Mancia to plead guilty, Mr. Mancia appeared and *said nothing* to the trial judge about his 2:00 a.m. meeting with an intoxicated Mr. Bennett; and (2) all of the plea documents had to be prepared and signed by Mr. Mancia, *before* the hearing began at 8:30 a.m. on February 4, 2008, something that would be very difficult for the prosecutor to accomplish between 8:00 a.m. and 8:30 a.m., on February 4, 2008.

years old was "25 years to 40/life" *not* "10 years to 40/life."[10]

At the beginning of the plea colloquy, Benton County Circuit Judge Tom Keith addressed all three defendants, collectively, and explained to them the important constitutional rights they would be giving up if they elected to plead guilty, rather than proceeding to trial. *Id. at 107.*[11] During this portion of the plea colloquy, each defendant was instructed to raise his hand if he understood the rights he was giving up by pleading guilty.

Judge Keith then addressed Mr. Mancia individually:

> THE COURT: Do you have trouble with your right hand, Mr. Mancia?
>
> MR. MANCIA: I understand – with the understanding –
>
> THE COURT: And do you understand that you have a right to see and hear the witnesses who testify against you? Do you understand that?
>
> MR. MANCIA: Yeah.
>
> THE COURT: And do you understand that you have the right to use the power of the Court to make someone appear who could testify favorably to you?

---

[10] As explained later, during the plea colloquy, the trial judge made it very clear to Mr. Mancia that, if he pled guilty to the charge of rape, he faced a minimum sentence of "twenty-five years" – *not ten years*, as erroneously stated in paragraph 7 of "Defendant's Statement." *Doc. 7-14 at 116-117.*

[11] At no point before or during the plea colloquy did either Mr. Mancia or Mr. Bennett request an interpreter or otherwise indicate to the court that Mr. Mancia had any problems understanding the questions or giving responsive answers in English.

MR. MANCIA: Yeah.

THE COURT: If there's someone out here who knows something that would be of benefit to you at trial, then you have a right to use the power of the Court to make that person appear and testify. Do you understand that?

MR. MANCIA: Yeah.

THE COURT: All right. You can drop your hands.

THE COURT: At trial you have the right to testify in your own defense; that is, to take the witness stand and deny committing the crime or giving the jury your version of whatever incident led to your arrest. You also have the right at trial not to testify. . . . and what's really important is if you choose to remain silent and not testify at trial, the State of Arkansas is prohibited from arguing that your silence is evidence of your guilt. Now, if you just – if you understand what – that particular matter, raise your right hand.

(All defendants hands raised.)

THE COURT: You understand all of that, Mr. Mancia?

MR. MANCIA: Yeah.

\* \* \*

THE COURT: ...the jury is instructed that it cannot consider your silence or your failure to deny committing the crime as evidence that you committed the crime. Does that make sense to you, Mr. Mancia[?]

MR. MANCIA: Yes, sir.

* * *

THE COURT: If you're found guilty you have an absolute right in Arkansas to appeal to a higher court; and if you cannot afford the cost of an appeal, then a free appeal will be provided to you.

A free appeal includes a verbatim, word-for-word, account, transcript, of your trial, and a transcript of your trial is necessary to enable you to appeal and they cost money. If you are indigent, can't afford it, then a free transcript would be provided to you to enable you to appeal. Also the assistance of legal counsel would be provided to you to enable you to appeal.

Now, if you understand these rights, raise your right hand.

MANCIA: (hand raised)

* * *

THE COURT: If you've made a decision of your own will to give up these rights and plead guilty, raise your right hand.

MANCIA: (hand raised)

*Id. at 108.*

Next, Judge Keith asked Mr. Mancia a series of specific questions that applied only to his individual guilty plea:

THE COURT: Mr. Mancia, state your full legal name.

DEFENDANT MANCIA: Antonio Mancia.

THE COURT: Antonio Mancia?

12

DEFENDANT MANCIA: Yes, sir.

THE COURT: What about the Cristobal, is that part of your name, too?

DEFENDANT MANCIA: Cristobal Antonio Mancia.

THE COURT: Okay. And how old are you?

DEFENDANT MANCIA: Thirty-five.

THE COURT: Thirty-five?

DEFENDANT MANCIA: Yes, sir.

THE COURT: And what's your home address?

DEFENDANT MANCIA: 1003 Convair Street, Bentonville.

THE COURT REPORTER: What street?

DEFENDANT MANCIA: Convair Street.

*MR. BENNETT*: Convair.

THE COURT: How long have you lived there?

DEFENDANT MANCIA: Three years.

THE COURT: Okay. How much education do you have?

DEFENDANT MANCIA: I just barely go to two grade.

THE COURT: About two grades?

DEFENDANT MANCIA: (Nodding affirmatively.)

THE COURT: Do you read and write in any language?

DEFENDANT MANCIA: Just a little bit.

THE COURT: A little bit?

DEFENDANT MANCIA: Yeah.

THE COURT: How was your paperwork handled?

DEFENDANT MANCIA: (No response.)

THE COURT: Did you – did Mr. Bennett read to you a document called a Defendant's Statement?

DEFENDANT MANCIA: Yes.

THE COURT: Okay. And did you understand what he read to you?

DEFENDANT MANCIA: Yes, sir.

THE COURT: Do you feel like you understood all of that stuff?

DEFENDANT MANCIA: Yes, sir.[12]

---

[12] Mr. Mancia signed the "Defendant's Statement" in the presence of Mr. Bennett on February 4, 2008. *Doc. 7-14 at 75*. In this "form document," Mr. Mancia "represents to the Court" that he is entering a knowing and voluntary guilty plea after discussing all facts surrounding the charges with Mr. Bennett, who has "done all that anyone could do to counsel and assist me, AND I AM SATISFIED WITH THE ADVICE AND HELP HE HAS GIVEN ME." *Id*.

Mr. Markum's Pre-Sentence Report states that Mr. Mancia "does not read much," which is consistent with Mr. Mancia's statement to Judge Keith that he could only read and write "a little bit" in Spanish or English. However, Mr. Markum noted that Mr. Mancia's "command of English is fair . . . [and] his command of spoken English is quite good." *Id. at 82, 86*.

Finally, even if Mr. Mancia was unable to read "Defendant's Statement," he made it clear to Judge Keith that Mr. Bennett had read that document to him *before he signed it*. *Id. at 112*. During the plea colloquy, Judge Keith also asked Mr. Mancia questions that tracked everything in

14

> THE COURT: Okay. Now – all right. Mr. Mancia, where were you born?
>
> DEFENDANT MANCIA: El Salvador.
>
> THE COURT: Okay. And how long have you been in the United States?
>
> DEFENDANT MANCIA: Since 1993.

*Id. at 111-13.*

Mr. Mancia then affirmed that he had discussed the rape charge and the evidence supporting that charge with Mr. Bennett, who had explained to him the facts the State would have to prove in order for a jury to find him guilty, as well as the minimum and maximum penalties:

> THE COURT: [A]t the time you entered a plea of not guilty the Court asked the State what is the status of the file. That – and in ... your case the State said the file is open, Judge. What that means is that you, through your attorney, have access to all the information about your case that the State has; that is, any written reports, the statements of witnesses, any tests that may have been performed, the police reports, everything. And – and the reason that's important is that it puts you in a position, through your attorney, to know what kind of evidence the State has that it would introduce at trial to convince the jury of your guilt.
>
> Now, what I expect to have happened ... that you have,

---

the "Defendant's Statement" to ensure he understood the full content of that document. *Id. at 102-116*.

number one, told your attorney all you know about your case; and if you have, raise your right hand.

MR. MANCIA: (hand raised)

THE COURT: Okay. That's important because it enables your attorney to – to check and see if – if some of the things that are being said or reported are accurate or if – or what kind of evidence the State may have, really to convince the jury of your guilt.

Now, what I expect to happen is that you have discussed with your attorney the evidence that the State has. And if you've done that, if your attorney has talked to you about what kind of evidence the State has, raise your right hand.

MR. MANCIA: (hand raised)

THE COURT: Okay. I expect your attorney to have explained to you what the State would have to prove in ... your case[ ] on each charge to – to enable the jury to convict you or find you guilty. I'm going to say this again. I expect in ... your case[ ] that your attorney has explained to you what facts a jury must have in order to find you guilty. And if your attorney has done that, raise your right hand.

MR. MANCIA: (hand raised)

THE COURT: Okay. And I expect your attorney to have explained to you what the minimum and maximum penalties are in the event you're found guilty of any and all of these charges. And if your attorney has done that, raise your right hand.

MR. MANCIA: (hand raised)

THE COURT: Okay. After you have found out what

you're charged with, what the State has to prove for you to be found guilty, what evidence the State has in order to prove its case against you and what the penalties are, after you have all of that, then you can make a decision on whether or not you should plead guilty, and you need to have all of that in order to make that decision.

Do you have all of that Mr. Mancia?

MR. MANCIA: Yes, sir.

*Id. at 113-15*.

Judge Keith *correctly explained* to Mr. Mancia that the statutory punishment range was a *minimum sentence of twenty-five years*, "up to the maximum" of life and that, within this range, "the Court can impose whatever penalty . . . [i]t feels is appropriate in your case":

> THE COURT: *[Mr.] Mancia. This is a plea to the Court; that is, you don't have a plea bargain with the State, Mr. Mancia. Do you understand that?*
>
> MR. MANCIA: *Yes, sir.*
>
> THE COURT: *And do you understand that the Court can impose whatever penalty within the statutory limits that the Court feels is appropriate in your case?*
>
> MR. MANCIA: *Yes, sir.*
>
> THE COURT: *Do you understand?*
>
> MR. MANCIA: *Yes, sir.*
>
> THE COURT: *Well, let's say that the law says – and this*

*is hypothetical, but if the law says that in a particular case a person could be sentenced to 10 to 40 years, or life, the Court could choose to sentence a person to 10 years, 20 years, 30 years, 40 years, or life. Any – whatever the Court feels is appropriate. Do you understand that?*

MR. MANCIA: *Yes, sir.*

THE COURT: *Now, Mr. – I assume Mr. Bennett has explained to you that in your case that the – that the minimum penalty, as I understand it, is 25 years.*

*MR. BENNETT*: *That's what I understand, Judge.*

THE COURT: *Has Mr. Bennett explained that to you?*

MR. MANCIA: *Yeah, he tell me that.*

THE COURT: *Well, do you understand that the Court can sentence you to 25 years or – or more, up to the maximum? Do you understand that?*

MR. MANCIA: *Yes, sir.*

THE COURT: *All right.*

\* \* \*

THE COURT: . . .*[Y]ou have to decide, Mr. Mancia, if your interest[s] are better served by a plea to the Court. And basically what you're betting is that the Court will sentence you to less time than what a jury would. Do you understand?*

MR. MANCIA: *Yes, sir.*

*Id. at 116-117* (emphasis added). Thus, Judge Keith *corrected* the error in the

"Defendant's Statement," regarding the minimum sentence Mr. Mancia faced, and made sure that Mr. Mancia understood he faced a *minimum sentence of twenty-five years* if he entered a guilty plea. *Id. at 74, 116-117.*

Finally, because Mr. Mancia was entering a guilty plea, *without a plea agreement*,[13] Judge Keith questioned him to make certain that no one had made any assurances or promises to him that, if he pled guilty, he would receive a sentence of twenty-five years or less:

> THE COURT: Now, Mr. Mancia, has anyone leaned on you or threatened you in any way to get you to plead guilty?
>
> MR. MANCIA: No, sir.
>
> THE COURT: Have you made this decision of your own free will?
>
> MR. MANCIA: Yes, sir, I did.

---

[13] In his habeas papers, Mr. Mancia makes the conclusory argument that Mr. Bennett's failure to negotiate a plea agreement constituted ineffective assistance of counsel. Given Mr. Mancia's post-*Miranda* statements aimed at normalizing his behavior in raping E.M. and blaming her for causing him to become sexually aroused, there is nothing in the record that even remotely suggests: (1) the prosecutor had any interest in offering Mr. Mancia a plea agreement; or (2) Mr. Bennett somehow failed to explore this subject with the prosecutor.

Given the nature of Mr. Mancia's post-*Miranda* statements, both Mr. Mancia and Mr. Bennett had to know that Mr. Mancia entering an unconditional guilty plea was his best chance to avoid a life sentence. As Judge Keith explained to Mr. Mancia, before he pled guilty: "[Y]ou have to decide, Mr. Mancia, if your interest[s] are better served by a plea to the Court. And basically what you're betting is that the Court will sentence you to less time than a jury would." *Doc. 7-14 at 117*. Mr. Mancia made that bet, and later lost when Judge Keith imposed a life sentence. Experiencing a bad case of "bettor's remorse," after entering a knowing and voluntary guilty plea, is not a ground for habeas relief.

> THE COURT: Has anyone promise[d] you leniency at all
> to get you to plead guilty?
>
> MR. MANCIA: No, sir.
>
> THE COURT: Has anyone said to you well, you know, if
> you'll plead guilty Judge Keith won't give you more than
> 25 years, that's the minimum. Has anyone said that?"
>
> MR. MANCIA: No, nobody tell me.

*Id. at 118-119*.

Judge Keith then asked Mr. Mancia if he had "any question[s] about any of [his] rights or any of the proceedings that led up to [his] being [in court] today?" Mr. Mancia responded, "No, sir." *Id. at 119*. When asked if he was satisfied with the "advice and counsel you've received from Mr. Bennett", Mr. Mancia responded, "Yes, sir." *Id*. When asked if he could "think of anything your [attorney] failed to do that your attorney should have done before you stood before the Court to plead guilty?" Mr. Mancia responded, "No, sir." *Id*.

Finally, Judge Keith asked Mr. Mancia to enter his plea to the charge of rape:

> THE COURT: Mr. Mancia, you're charged with rape, a
> Class Y felony. As to that charge, how do you plead?
>
> MR. MANCIA: Guilty, Your Honor.
>
> THE COURT: Guilty?
>
> MR. MANCIA: Guilty, Your Honor.

*Id. at 115*.

The prosecutor then recited the Agreed Statement of Facts:

> PROSECUTOR: The agreed statement of facts that's been signed off on by myself, Mr. Bennett, and Mr. Mancia and we'll present to the Court, it reads on various dates in 2006 through May 2007, the Defendant engaged in deviate sexual activity and sexual intercourse with E.M., who was five and six years old at the time. More specifically, he penetrated her vagina with his fingers and penis. E.M. is the defendant=s adopted daughter.

> * * *

> THE COURT: I know you signed off, but I'm going to B I'm asking you on the record, do you dispute those facts [in the agreed statement of facts]?

> MR. MANCIA: That mean I'm guilty, right?

> THE COURT: What did he say?

> *MR. BENNETT*: He asked – he agreed with that. He says yes.

> THE COURT: All right. Does that mean that you agree this is a correct statement of the facts?

> MR. MANCIA: Yes, sir.

*Id. at 120-21*.

The prosecutor then stated: "Your Honor, I know you've already mentioned this, but I wanted to put on the record again that the minimum is 25 years, and the range is 25 to 40, or life." *Id. at 121. With this final reiteration of the correct range*

21

*of punishment Mr. Mancia faced*, Judge Keith advised Mr. Mancia that he was "going to accept your plea of guilty and order a presentence report and I will schedule a sentencing for 30 days." *Id.*

After Mr. Mancia entered his guilty plea, Probation/Parole Officer Michael Markum interviewed him as part of a presentence investigation. *Id. at 81-90*. In his Pre-Sentence Report, dated February 29, 2008, Mr. Markum recommended that the court impose a sentence of "35 years in the DOC [Department of Correction] and a permanent no contact order with the victim and her family." *Id. at 89*.

On February 28, 2008, Mr. Bennett submitted a form requesting Judge Keith to provide a Spanish interpreter for Mr. Mancia's ex-wife, Maria Orellana, who was scheduled to testify at the sentencing hearing on March 3, 2008. *Id. at 78*.

During the March 3, 2008 sentencing hearing, Mr. Bennett called four character witnesses.[14] *Id. at 123-152*. The interpreter translated the questions asked to and the answers given by Tammy Mancia and Maria Orellana.[15]   *Id. at 128, 133*.

The prosecutor argued that Judge Keith should impose a sentence of between forty years, *as a starting point*, and life, which the prosecutor clearly favored:

---

[14] These character witnesses were Mr. Mancia's friend, Simon Sandoval; Mr. Mancia's two ex-wives, Tammy Mancia and Maria Orellana (previously Maria Mancia); and Mr. Mancia's ex-sister-in-law, Maria Marta Orellana.

[15] Mr. Sandoval testified that he did not require an interpreter. Maria Marta Orellana also testified without assistance from the interpreter. *Doc. 7-14 at 126, 141-143*.

> Does Mr. Mancia deserve life? Maybe. He's given [E.M.]
> a life sentence.
>
>                    * * *
>
> To him his daughter was coming on to him. She was
> flirting with him to try to get out of doing some homework.
> . . . This is the perspective of a pedophile. The Court can
> lock him up for three life times, Your Honor, and he's not
> going to change. He is what he is. And while 40 years may
> not seem like [] enough, it's a good place to start.

*Id. at 144-145.*

Judge Keith then allowed Mr. Mancia to exercise his right of allocution. Mr.

Mancia initially addressed the court in English but stated that he wanted to use the

interpreter to translate his statement of allocution, which he delivered in Spanish:

> THE COURT: Mr. Mancia, is there anything you wish to
> tell the Court – say to the Court before the Court
> pronounces sentence?
>
> MR. MANCIA: Do we go there?
>
> THE COURT: Yes.
>
> MR. MANCIA: Good morning, Your Honor.
>
> THE COURT: Good morning.
>
> MR. MANCIA: I'm going to tell the interpreter what I'm
> going to tell you (pause in the proceedings) [*at this point
> Mr. Mancia begins speaking in Spanish and the
> interpreter begins translating*] I would like to tell the
> judge that I regret everything that happened. In the name
> of Jesus Christ I ask him to forgive me, also the judge. And
> I'm willing to pay my sentence, but I ask the judge to take

into consideration my family and my kids. Thank you very
much.

*Id. at 148-149.*[16]

Judge Keith then gave Mr. Mancia a life sentence, the maximum punishment:

> THE COURT: Mr. Mancia, when you chose to violate this
> child, you gave her a life sentence.

> THE INTERPRETER: Your Honor, could you repeat?

> THE COURT: When you chose to violate this child, you
> gave this child a life sentence. You understand?

> MR. MANCIA: (Nodding affirmatively.)

> THE COURT: Today I'm giving you a life sentence.

*Id. at 150. See also* Judgment and Commitment, *Doc. 7-2.*

On April 3, 2008, Mr. Bennett filed a timely notice of appeal to the Arkansas

Supreme Court. *Doc. 7-3 at 44-45.*[17] After receiving two extensions of time to file

---

[16] Judge Keith did *not* ask Mr. Mancia to explain why, at the "eleventh hour", he had
decided to make use of the interpreter (who had been requested for his ex-wife, Ms. Orellana – not
Mr. Mancia) to deliver his statement of allocution. This decision may have been tactical, to make
Mr. Mancia appear more sympathetic to the court. It also may have been pragmatic – to ensure
that *every word* in his statement of allocution was properly articulated to the court in perfect
English. However, regardless of his reason for doing so, *nothing* in the record supports Mr.
Mancia's belated argument that his limited use of the interpreter to deliver his short statement of
allocution is evidence he was not sufficiently fluent in English to enter a knowing and voluntary
guilty plea.

[17] Although Arkansas law does not ordinarily allow a criminal defendant to appeal from a
guilty plea, there is an exception that authorizes such an appeal if the defendant alleges sentencing
errors. See Ark. R. App. P. Crim. 1(a); Ark. R. Crim. P. 24.3(b) (2008); *Mancia v. State*, 2010
Ark. 247.

his Appellate Brief, Mr. Bennett filed a third motion for extension of time on the same day the Appellate Brief was due. *Mancia v. State*, 2009 Ark. 208, at 1, 306 S.W.3d 10, 11. The Arkansas Supreme Court denied the motion and held Mr. Bennett to be in contempt for filing an untimely Appellate Brief.[18] *Id*.

Mr. Bennett then filed an *untimely* Appellate Brief. Relying on *Anders v. California*, 386 U.S. 739 (1967), he argued there was no "merit" to Mr. Mancia's appeal of his life sentence. *Doc. 7-3*. The Arkansas Supreme Court provided Mr. Mancia with a copy of Mr. Bennett's "no merit" brief, and gave him the opportunity to file *pro se* points for reversal. *See Mancia v. State*, 2009 Ark. 280, 308 S.W.3d 612; *Mancia v. State*, 2010 Ark. 247. Mr. Mancia elected not to avail himself of that opportunity.

On May 20, 2010, the Arkansas Supreme Court found Mr. Mancia's appeal of his life sentence to be without merit:

> In this case, the plea was entered without benefit of a plea agreement, and appellant was provided a hearing for sentencing purposes. Counsel asserts that there were no adverse rulings, however, and our review of the record confirms that there were no objections to the evidence presented to the court. . . . Consequentially, there were no adverse rulings so as to merit an appeal.

---

[18] The Arkansas Supreme Court fined Mr. Bennett $250 and forwarded a copy of its ruling to the Committee on Professional Conduct.

*Mancia v. State*, 2010 Ark. 247 (*Mancia I*).

On July 19, 2010, Mr. Mancia's new attorney, Dana Reece, filed a Rule 37 Petition, in which she made the following bare-bones claims that Mr. Bennett had provided Mr. Mancia with ineffective of assistance of counsel:[19]

> a. [B]eing intoxicated at the [guilty plea] hearings and suffering from alcohol abuse, thereby impairing his judgment and ability to function as Defendant's counsel.
>
> b. [F]ailing to investigate the statement of the victim [E.M.] prior to the entry of the guilty plea since the victim did not speak English and none of the officers [Officer Beeler and Sgt. Thompson] could speak Spanish. The person that assisted in the so-called translation [Ms. Valle, E.M.'s aunt] had a reason to fabricate and embellish the statement of the victim, thus it was important for counsel to investigate the manner the statement was taken prior to the entry of the guilty plea.
>
> c. [F]ailing to investigate the statement of Defendant prior to the entry of the guilty plea since Defendant's use of

---

[19] On April 26, 2018, Mr. Bennett was disbarred for making false representations and engaging in unauthorized actions, while managing a client's trust account. *Ligon v. Bennett*, Ark. Sup. Ct. No. D-11-1259 (records accessible at https://caseinfo.aoc.arkansas.gov). Before his disbarment, Mr. Bennett had a long history of disciplinary sanctions imposed by the Supreme Court Committee on Professional Conduct. These sanctions included: a reprimand in 2001 for making a false statement to a tribunal (CPC Docket No. 2001-091); a reprimand in 2006 for failing to perfect an appeal in a workers compensation case (CPC Docket No. 2006-091); a three month suspension in 2009 that was related to Mr. Bennett's failure to file a timely brief in Mr. Mancia's direct appeal (CPC Docket No. 2009-72); a six month suspension in 2009 for failing to provide diligent and competent representation, communicate with his client, or have a written fee agreement (CPC Docket No. 2009-058); and a nine month suspension in 2010 for failing to file a motion to dismiss or timely answer or keep his clients reasonably informed (CPC Docket No. 2009-065). Mr. Bennett's disciplinary records are accessible online. *See* https://www.arcourts.gov/administration/professional-conduct/opinions.

English was extremely limited and none of the officers could speak Spanish. A motion to suppress the statement should have been filed and pursued by counsel prior to the entry of the guilty plea.

d.  [F]ailing to advise Defendant that a guilty plea would subject him to a minimum sentence of twenty-five years. Defendant was le[d] to believe from counsel that the Court would impose a sentence [of] less than twenty-five years if he [pled] guilty and allowed the Court to impose the sentence.

e.  [F]ailing to pursue a plea agreement with the State for a set number of years as opposed to subjecting Defendant to a life sentence.

f.  [F]ailing to have a translator present during all conversations with Defendant to insure that he fully understood the evidence against him and the potential sentence he could receive by pleading guilty.

g.  [F]ailing to insure that a translator was present at every hearing where Defendant could fully understand the proceedings since his use of the English language was limited.

h.  [F]ailing to inform Defendant that he would not have a right to appeal from a guilty plea absent some error in the sentencing proceeding. In fact, counsel filed an appeal in which he subsequently filed a no-merit brief.

*Doc. 7-8 at 3-5.*

On February 7, 2011, without conducting an evidentiary hearing, the trial court addressed and rejected each of Mr. Mancia's Rule 37 claims. *Doc. 7-10 at 1-*

27

*6.*[20]

On May 31, 2011, Mr. Mancia filed a Notice of Appeal to the Arkansas Supreme Court. *Doc. 7-13 at 2*. On December 1, 2011, Ms. Reece filed an *untimely* Appellate Brief in which she argued that the trial court erred by failing to conduct an evidentiary hearing to develop the facts surrounding the following ineffective assistance of trial counsel claims raised in the Rule 37 Petition:

> (1) Mr. Bennett was "intoxicated at the [guilty plea] hearing and suffering from alcohol abuse, thereby impairing his judgment and ability to function as [Mr. Mancia's] counsel[;]"

> (2) Mr. Bennett failed to "investigate the statement of the victim [E.M.] prior to the entry of the guilty plea since the victim did not speak English and none of the officers [Officer Beeler and Sgt. Thompson] could speak Spanish[;]"

> (3) Mr. Bennett failed to "investigate the statement of [Mr. Mancia] prior to the entry of the guilty plea since [Mr. Mancia's] use of English was extremely limited and none of the officers could speak Spanish[;]" and

> (4) Mr. Bennett failed to "advise [Mr. Mancia] that a guilty plea would subject him to a minimum sentence of twenty-five years" and failed to pursue a plea bargain with the prosecutor.

*See* Court's Exhibit 1 (*Doc. 35 at 17-19*).[21]

---

[20] Benton County Circuit Judge Robin Green presided over Mr. Mancia's Rule 37 proceeding.

[21] The Court obtained a copy of Ms. Reece's Appellate Brief from the Clerk of the Arkansas

Based on abstracting deficiencies in Ms. Reece's Appellate Brief, the Court ordered rebriefing.[22] *Mancia v. State*, 2014 Ark. 206, at 2. Mr. Mancia then hired Craig Lambert to represent him in his Rule 37 appeal. *See Doc. 7-11 at 33*.

On July 1, 2014, Mr. Lambert refiled an Appellate Brief in which he argued that: (1) Mr. Mancia's guilty plea was not knowing or voluntary, and was based on ineffective assistance of counsel;[23]  (2) the trial court erred in denying Rule 37 relief, without conducting an evidentiary hearing; and (3) pursuant to *Martinez v. Ryan*,

---

Supreme Court. A copy of Ms. Reece's Appellate Brief, marked Court's Exhibit 1, has been made a part of the record in this case. *Doc. 35*.

[22] At the time the Court ordered rebriefing, Ms. Reece was serving a three-year suspension from appellate practice for failing to file a timely brief in a separate Rule 37 appeal. *See* Supreme Court Committee on Professional Conduct Docket No. 2011-085 (Apr. 24, 2012). For that reason, she could not represent Mr. Mancia further in his Rule 37 appeal.

Ms. Reece was later suspended for three more years based on the errors she committed in handling Mr. Mancia's Rule 37 appeal. This suspension began November 28, 2012, and ran concurrent with the earlier three-year suspension. Supreme Court Committee on Professional Conduct Docket No. 2012-051 (Nov. 28, 2012).

On August 7, 2018, Ms. Reece was suspended from practicing law in Arkansas for six months and fined $50 because she failed to attend a scheduled hearing in Pulaski County Circuit Court. Supreme Court Committee on Professional Conduct Docket No. 2018-010 (Aug. 7, 2018). These records are accessible at https://www.arcourts.gov/administration/professional-conduct/opinions.

[23] Mr. Lambert argued that Mr. Bennett: (1) was intoxicated; (2) did not investigate the victim=s statement to the police; (3) did not investigate or move to suppress Mr. Mancia's statement and did not secure an interpreter; (4) did not inform Mr. Mancia of the accurate minimum sentence; (5) failed to pursue a set sentence in a plea deal prior to Mr. Mancia's plea; (6) did not have an interpreter present at all conversations with Mr. Mancia; (7) did not have an interpreter present during all court proceedings; and (8) did not inform Mr. Mancia that, by pleading guilty, he was giving up the right to appeal.

566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), Mr. Mancia was entitled to a new Rule 37 proceeding, with the assistance of appointed counsel, because Ms. Reece was constitutionally ineffective in her representation of Mr. Mancia. *Doc. 7-11.*

On March 19, 2015, the Arkansas Supreme Court affirmed the trial court's denial of Rule 37 relief. *Mancia v. State*, 2015 Ark. 115, 459 S.W.3d 259 (Ark. 2015) (*Mancia II*). In doing so, the Court analyzed and rejected each of Mr. Mancia's ineffective-assistance claims under *Strickland v. Washington*, 466 U.S. 668 (1984), and *Hill v. Lockhart*, 474 U.S. 52 (1985).

On January 4, 2016, Mr. Mancia initiated this *pro se* § 2254 habeas action, in which he asserts seventeen separate claims:

> Claim 1:    Mr. Bennett was constitutionally ineffective because he failed to have an interpreter present during meetings with Mr. Mancia, resulting in the entry of an unknowing and involuntary guilty plea;

> Claim 2:    Mr. Bennett was constitutionally ineffective because he failed to have an interpreter present during Mr. Mancia's plea hearing, resulting in the entry of an unknowing and involuntary guilty plea;

> Claim 3:    Mr. Bennett was constitutionally ineffective because he did not adequately inform Mr. Mancia of the consequences of pleading guilty, and led him to believe he would receive a sentence of less than twenty-five years, resulting in the entry of an unknowing and involuntary guilty plea;

> Claim 4:    Mr. Bennett was constitutionally ineffective because he misinformed Mr. Mancia and his family regarding the availability of a direct appeal, resulting in the entry of an unknowing and involuntary guilty plea;

Claim 5:    Mr. Bennett was constitutionally ineffective because he was in "a continuous state of alcoholism" while representing Mr. Mancia, resulting in the entry of an unknowing and involuntary guilty plea;

Claim 6:    Mr. Bennett was constitutionally ineffective because he has a history of sanctions by the Committee on Professional Conduct;

Claim 7:    Mr. Bennett was constitutionally ineffective because he failed to investigate Mr. Mancia's case;

Claim 8:    Mr. Bennett was constitutionally ineffective because he failed to investigate E.M.'s statement to the police, resulting in the entry of an unknowing and involuntary guilty plea;

Claim 9:    Mr. Bennett was constitutionally ineffective because he failed to investigate or challenge Mr. Mancia's statement to police, resulting in the entry of an unknowing and involuntary guilty plea;

Claim 10:    During custodial police interrogation, Mr. Mancia was not adequately and effectively advised of his rights, resulting in a coerced confession in violation of the Fifth Amendment;

Claim 11:    Mr. Bennett was constitutionally ineffective because he did not seek to obtain a plea agreement from the State for a lesser sentence prior to Mr. Mancia's guilty plea;

Claim 12:    Mr. Bennett was constitutionally ineffective on direct appeal because he contracted to work on the direct appeal with Mr. Mancia's family, without Mr. Mancia's knowledge, missed the appellate filing deadlines, and filed a no-merit brief;

Claim 13:    Ms. Reece was constitutionally ineffective for failing to utilize the full ten-page limit for the Appellate Brief she filed in Mr. Mancia's Rule 37 appeal;

Claim 14:    Ms. Reece was constitutionally ineffective because she did not factually support the argument that an evidentiary hearing was required in

Mr. Mancia's Rule 37 proceeding;

Claim 15:    Ms. Reece was constitutionally ineffective because she missed deadlines in connection with Mr. Mancia's Rule 37 appeal;

Claim 16:    The trial court erred in failing to conduct an evidentiary hearing on his Rule 37 post-conviction petition; and

Claim 17:    Mr. Mancia is entitled to an evidentiary hearing on his § 2254 habeas claims, under *Martinez* and *Trevino*, because he received ineffective assistance of counsel from Ms. Reece in his Rule 37 proceeding.

*Doc. 1, as amended by Doc. 12.*[24]

Respondent contends that all of Mr. Mancia's habeas claims should be dismissed, with prejudice, because they are: (1) without merit; (2) procedurally defaulted due to his failure to properly raise them in state court; (3) waived by his guilty plea; or (4) not cognizable in a § 2254 habeas action. *Doc. 7.*

For the reasons discussed below, the Court concludes that all of Mr. Mancia's habeas claims must be dismissed, with prejudice.

## II. Discussion

## A.    Mr. Bennett's Ineffective Assistance Of Counsel Caused Mr. Mancia To Enter An Unknowing And Involuntary Guilty Plea (Claims 1 – 6)

Habeas challenges to a guilty plea are limited to claims that the plea was involuntary or unknowing, *i.e.*, the petitioner did not understand the charge to which

---

[24] On March 21, 2016, the Court allowed Mr. Mancia to amend his habeas Petition to add Claims 10 and 12. *Docs. 12, 17.*

he pled guilty or the consequences of entering the plea of guilty. *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985). Where "a defendant is represented by counsel . . . and enters his [guilty] plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Id.* at 56.

Habeas challenges to a guilty plea, based on ineffective assistance of counsel, are governed by *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a petitioner to establish that: (1) the attorney's conduct fell below "an objective standard of reasonableness"; *and* (2) the attorney's deficient performance prejudiced the petitioner. *Id.* at 687-88.[25] In the context of a guilty plea, "prejudice" requires a showing that, but for counsel's deficient performance, the defendant would *not* have pleaded guilty and would have proceeded to trial. *Hill*, 474 U.S. at 58-59.

While the *Strickland* standard is deferential, in and of itself, federal habeas review is "doubly deferential" when a state's highest appellate court has made a final

---

[25] Under the first prong of *Strickland*, the court must "determine, whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions." *Abernathy v. Hobbs*, 748 F.3d 813, 816 (8th Cir. 2014) (internal quotations and citations omitted). Under the second prong, "the petitioner must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011). If a prisoner fails "to establish either *Strickland* prong [it] is fatal to an ineffective-assistance claim." *Id.*

adjudication of a habeas petitioner's ineffective-assistance claims.[26] Under this "doubly deferential" standard, the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011); *see Barnes v. Hammer*, 765 F.3d 810, 814 (8th Cir. 2014) (in "doubly deferential" federal habeas review, "we do not directly assess counsel's performance; we assess the state courts' assessment of counsel's performance"). Meeting this very high bar is always a daunting task for a habeas petitioner.[27]

Finally, the Supreme Court has made it clear that demonstrating "an *unreasonable* application of federal law" requires more than merely showing "an *incorrect* application of federal law." *Harrington*, 562 U.S. at 101. Thus, a habeas petitioner must first surmount *Strickland's* "high bar" for establishing ineffective

---

[26] In this case, the Arkansas Supreme Court considered and rejected Claims 1 – 5, on the merits, in affirming the trial court's denial of Rule 37 relief. *Mancia v. State*, 2015 Ark. 115. Because Mr. Mancia failed to raise Claim 6 in his Rule 37 Petition, the Arkansas Supreme Court did not address it in affirming the trial court's denial of Rule 37 relief. *Id.*

[27] Where a state's highest court has finally adjudicated an ineffective assistance of counsel claim, on the merits, a federal habeas court may grant habeas relief in only three limited situations: (1) when the state court adjudication was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); (2) when the state court adjudication "involved an unreasonable application" of clearly established federal law, *id.*; or (3) when the state court adjudication "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

assistance of counsel and then satisfy § 2254(d)'s even more rigorous standard which requires a petitioner to prove that the state court's application of *Strickland* was *unreasonable*. *Id.* at 105 (citations omitted).

### 1. Mr. Mancia Entered An Unknowing And Involuntary Guilty Plea Because Mr. Bennett Failed To Have An Interpreter Present At Meetings With Mr. Mancia And At The Plea Hearing (Claims 1 and 2)

Mr. Mancia argues that, because of his limited proficiency in speaking and understanding English: (1) he could not communicate effectively with Mr. Bennett; and (2) he required an interpreter at his plea hearing in order to understand what was taking place.[28]  As a result, Mr. Mancia contends that his guilty plea was not knowing and voluntary. *Doc. 1 at 11-12, 33-35*.[29]

In Mr. Mancia's Rule 37 appeal, the Arkansas Supreme Court flatly rejected both of these claims:

> Here, despite Mancia's allegations, [...] a review of the record

---

[28] Mr. Mancia specifically alleges that Mr. Bennett was constitutionally ineffective because he did not have an interpreter present: (1) during each of their attorney-client meetings; and (2) at the plea hearing to ensure that Mr. Mancia understood the charges brought by the State and all of the trial court's questions and statements made during the plea colloquy, as well as the statements made by Mr. Bennett and the prosecutor.

[29] According to Mr. Mancia, at the time he entered his guilty plea, he did not speak, read, or write English and Mr. Bennett could not speak, read or write Spanish. *Doc. 1 at 11*. As previously explained, the record in this case clearly establishes that Mr. Mancia had a good understanding of spoken English and was capable of speaking English well enough to communicate in complete and understandable sentences. Based on his limited education, Mr. Mancia probably did have some difficulty reading and writing in Spanish and English.

demonstrates that Mancia understood the proceedings and communicated without hesitation. Without citing to specific language, Mancia generally refers to the record as support. However, the following colloquy occurred during the plea hearing:

> The Court: [A]t the time you entered a plea of not guilty the Court asked the State what is the status of the file. That – and in ... your case the State said the file is open, Judge. What that means is that you, through your attorney, have access to all the information about your case that the State has; that is, any written reports, the statements of witnesses, any tests that may have been performed, the police reports, everything. And – and the reason that's important is that it puts you in a position, through your attorney, to know what kind of evidence the State has that it would introduce at trial to convince the jury of your guilt.

> Now, what I expect to have happened ... that you have, number one, told your attorney all you know about your case; and if you have, raise your right hand.

> [Mancia] hand raised.

> The Court: Okay. That's important because it enables your attorney to – to check and see if – if some of the things that are being said or reported are accurate or if – or what kind of evidence the State may have, really to convince the jury of your guilt.

> Now, what I expect to happen is that you have discussed with your attorney the evidence that the State has. And if you've done that, if your attorney has talked to you about what kind of evidence the State has, raise your right hand.

> [Mancia] hand raised.

> The Court: Okay. I expect your attorney to have explained to you what the State would have to prove in ... your case[ ] on each charge to – to enable the jury to convict you or find you guilty. I'm going to say this again. I expect in ... your case[ ] that your attorney has explained to you what facts a jury must

have in order to find you guilty. And if your attorney has done that, raise your right hand.

[Mancia] hand raised.

The Court: Okay. And I expect your attorney to have explained to you what the minimum and maximum penalties are in the event you're found guilty of any and all of these charges. And if your attorney has done that, raise your right hand.

[Mancia] hand raised.

The Court: Okay. After you have found out what you're charged with, what the State has to prove for you to be found guilty, what evidence the State has in order to prove its case against you and what the penalties are, after you have all of that, then you can make a decision on whether or not you should plead guilty, and you need to have all of that in order to make that decision.

Do you have all of that Mr. Mancia?

Defendant Mancia: Yes, sir.

Here, the record demonstrates that Mancia understood the proceedings. ... Pursuant to *Strickland*, Mancia must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced his defense to such an extent that the petitioner was deprived of a fair trial. "To establish prejudice and prove that he was deprived of a fair trial due to ineffective assistance of counsel, an appellant who has [pleaded] guilty must demonstrate a reasonable probability that, but for counsel's errors, he would not have so pleaded and would have insisted on going to trial. *Buchheit v. State*, 339 Ark. 481, 6 S.W.3d 109 (1999) (per curiam) (citing *Hill v. Lockhart*, 474 U.S. 523 (1985))." *Olivarez*, 2012 Ark. 24, at 4, 2012 WL 234632. Mancia has failed to meet this burden and we affirm the circuit court.
...

Seventh, Mancia's argument [that defense counsel was ineffective in failing to ensure that a translator was present at every hearing] is the same argument addressed regarding the translator in [above.] For those same reasons, we reject Mancia's seventh argument and find no clear error in the

circuit court's decision to deny relief on his claim.

*Mancia II*, 459 S.W.3d at 272-74.

In determining if a criminal defendant is sufficiently fluent in English to enter a knowing and voluntary guilty plea, courts must examine the record, as a whole, paying particular attention to: (1) the degree and extent of the defendant's communications with the court, in English; and (2) whether the defendant requested an interpreter or otherwise put the court on notice that he was having difficulty understanding the proceeding. *See Tran v. Lockhart*, 849 F.2d 1064, 1068 (8th Cir. 1988).[30] Courts also should consider how long the defendant has lived in the United

---

[30] In *Tran*, the petitioner claimed his guilty plea should be set aside because of his unfamiliarity with the English language, combined with the ineffective assistance of his court-appointed counsel. At the outset the Court noted that: "Once a person has entered a guilty plea, any subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, *as are contentions that in the face of the record are wholly incredible.*" *Id.* at 1068 (emphasis added). After reviewing the transcript of the plea hearing, the Eighth Circuit rejected Tran's contention that "he could not speak the native English language except for yes or no[:]"

> Tran us[ed] such phrases as: I do understand; no, sir; yes, I signed it; yeah, I understand what he told me; I have no questions; I am twenty; and I plead guilty . . . Aside from some syntactical errors, his testimony on the whole appears to be very responsive and indicative of his ability to understand the proceedings and intelligently participate in his defense."

*Id. Accord: United States v. Osoria*, 1 F.3d 1237 (5th Cir. 1993) (concluding that the defendant had an adequate understanding of the English language, noting that (1) Osoria lived in the United States for over twenty years prior to his indictment; (2) neither Osoria nor his counsel requested an interpreter at any hearings prior to the plea; (3) Osoria requested appointment of counsel in a handwritten letter in English to the district court; (4) Osoria testified in English on his own behalf and responded to cross-examination without demonstrating a language deficiency in a suppression hearing; (5) at Osoria's plea hearing, the district court inquired into Osoria's comprehension of the

States, the level of the defendant's education, and any other evidence relevant to evaluating the defendant's ability to understand English. *Ramos-Martinez v. United States*, 638 F.3d 315, 319-20 (1st Cir. 2011);[31]  *United States v. Osoria*, 1 F.3d 1237, at *1-4 (5th Cir. 1993).

In this case, Mr. Mancia's lengthy post-*Miranda* interview with Sgt. Thompson and Officer Beeler, on May 13, 2007, makes it clear that he had a good understanding of spoken English and was capable of speaking English in complete and understandable sentences. *Doc. 33-1*. During the pretrial hearing on February 4, 2008, neither Mr. Mancia nor Mr. Bennett informed Judge Keith that Mr. Mancia

---

English language and urged Osoria to inform the court if he had difficulties in understanding or communicating in English so that an interpreter could be provided; and (6) after an interpreter was provided, Osoria responded to questioning without the benefit of the interpreter's translation, and often responded in English); *United States v. Rahman*, 647 F. App'x 955, 956 (11th Cir. 2016), (while the defendant needed clarification at a few points during his change of plea hearing, the record as a whole demonstrated that he understood the nature and significance of the proceeding: (1) he was able to communicate with the judge and his attorney during the hearing; and (2) neither he nor his attorney asked for an interpreter or objected to the lack of one).

[31] In *Ramos-Martinez*, the petitioner filed a § 2255 habeas action in which he argued that his lack of proficiency in speaking and understanding English caused him to enter an unknowing and involuntary guilty plea. The First Circuit noted that, during the plea colloquy: (1) defense counsel informed the district court that the petitioner did *not* speak English; (2) materials in the record evidenced petitioner's limited education and low proficiency in the English language; and (3) there was no indication that an interpreter was present for the petitioner to use during the plea colloquy. *Id*. at 320, 325. Accordingly, the Court reversed and remanded the dismissal of the § 2255 habeas petition and directed the trial court to conduct an evidentiary hearing on whether the petitioner entered a knowing and voluntary plea.

had *any difficulty* understanding and speaking English, much less that he needed an interpreter. During the lengthy plea colloquy, a number of Mr. Mancia's answers to Judge Keith's questions went well beyond simple "yes" and "no" responses and included Mr. Mancia providing his full name, age, address, place of birth, and highest level of education. *Doc. 7-14 at 111-112.*

A Benton County Parole Officer, Mr. Markum, interviewed Mr. Mancia, shortly after he entered his guilty plea, and used the information he obtained from Mr. Mancia in preparing his Pre-Sentence Report, dated February 29, 2008. *Id. at 81-90.* Mr. Mancia participated in this interview, without an interpreter, and Mr. Markum noted that Mr. Mancia's command of English is "fair" and "his command of spoken English is quite good." *Id. at 82, 86.*

Mr. Markum's evaluation of Mr. Mancia's English proficiency is *entirely consistent with*: (1) what would be expected from someone like Mr. Mancia, who had been living in the United States for approximately fourteen years, the last ten of which were spent in Bentonville working at Wal-Mart's headquarters performing maintenance on its truck fleet (*Id. at 82*); (2) the way Mr. Mancia understood and responded to the questions he was asked by Sgt. Thompson and Officer Beeler during his lengthy post-*Miranda* interrogation on May 13, 2007(*Doc. 33-1*); and (3) the way Mr. Mancia understood and responded to the questions he was asked by

Judge Keith during the plea hearing on February 4, 2008 (*Doc. 7-14 at 107-122*).[32]

Finally, Mr. Mancia did not request an interpreter for the plea hearing or inform Judge Keith that his lack of proficiency in English limited his ability to understand and answer the many questions he was asked during the plea colloquy.

In light of these facts, the Arkansas Supreme Court did not unreasonably apply *Strickland*, in rejecting Mr. Mancia's claims that Mr. Bennett provided ineffective assistance of counsel by not having a Spanish interpreter present during their meetings and at the plea hearing. Similarly, nothing about the Arkansas Supreme Court's adjudication of those claims was based on an unreasonable determination of the facts in light of the record. Indeed, the record as a whole demonstrates that Mr. Mancia's ability to speak and understand English made an interpreter unnecessary, both for his meetings with Mr. Bennett and the February 4, 2008 pretrial hearing where he entered a knowing and voluntary guilty plea to the charge of rape.

## 2. Mr. Bennett's Failure To Inform Mr. Mancia Of The Correct Sentencing Range Caused Him To Enter An Unknowing And Involuntary Guilty Plea (Claim 3)

Mr. Mancia contends that, prior to entering his guilty plea, Mr. Bennett "led

---

[32] Mr. Mancia answered many of Judge Keith's questions with "yes" or "no," or raising his hand. However, those were the appropriate responses to the questions he was asked. However, when Judge Keith asked him open-ended questions, Mr. Mancia spoke clear and understandable English and provided the requested information about his age, home address, where he was born, how long he had lived in the United States, and the extent of his educational background.

[him] to believe . . . that the trial court would impose a sentence of less than twenty-five years." *Doc. 1 at 9*. Mr. Mancia bases this claim almost entirely on the content of "Defendant's Statement," which he signed on February 4, 2008. *Doc. 7-14 at 74-75*. In paragraph 7 of that document, it *erroneously states* "the punishment which the law provided for the offense . . . charged in the information [rape] is: imprisonment from 10 to 40/life[.]" *Id*. In fact, the correct sentencing range was "25 years to 40/life."

According to Mr. Mancia, he based his decision to plead guilty on the representation in paragraph 7 of that document, which stated the minimum sentence was *ten years*. *Doc. 1 at 30-31*. He further alleges that Mr. Bennett led him to believe that: (1) the minimum punishment he faced was *ten years* in prison; *and* (2) Judge Keith would impose a sentence of less than twenty-five years. *Id. at 30*.

In affirming the trial court's denial of Rule 37 relief, the Arkansas Supreme Court explicitly rejected this claim and gave compelling reasons for doing so:

> Despite the error on "Defendant's Statement," the record demonstrates that Mancia was advised multiple times of the proper sentence:
>
> > The Court: Well, let's say that the law says – and this is hypothetical, but if the law says that in a particular case a person could be sentenced to 10 to 40 years, or life, the Court could choose to sentence a person to 10 years, 20 years, 30 years, 40 years, or life. Any – whatever the Court feels is appropriate. Do you understand that?
> >
> > Defendant Mancia: Yes, sir.

The Court: *Now, ...– I assume [defense counsel] has explained to you that in your case that the–that the minimum penalty, as I understand it, is 25 years.*

Defense Counsel: *That's what I understand, Judge.*

The Court: *Has [defense counsel] explained that to you?*

Defendant Mancia: *Yeah, he tell me that.*

The Court: *Well, do you understand that the Court can sentence you to 25 years or – or more, up to the maximum? Do you understand that?*

Defendant Mancia: *Yes, sir.*
....
The Court: *Has anyone said to you well, you know, if you'll plead guilty Judge Keith won't give you more than 25 years, that's the minimum. Has anyone said that?*

Defendant Mancia: *No.*

\* \* \*

Here, the record demonstrates that Mancia was informed and aware of the twenty-five year minimum sentence prior to the entry of his guilty plea. We also note that Mancia does not assert that but for the alleged error he would not have pled guilty or that his guilty plea was premised on his belief that the minimum sentence was ten years.

*Mancia II*, 459 S.W.3d at 269-71 (emphasis added).[33]

---

[33] The Eighth Circuit reached a similar holding, in the context of trial counsel's erroneous advice under the Federal Sentencing Guidelines:

Inaccurate advice of counsel about the sentencing guidelines or likely punishment does not render involuntary a defendant's decision to plead guilty, so long as the defendant is informed of the maximum possible sentence permitted by statute and the court's ability to sentence within that range.

Importantly, prior to entering his guilty plea, Mr. Mancia explicitly acknowledged, in open court, that *Mr. Bennett had correctly advised him that the minimum sentence was twenty-five years*. *Doc. 7-14 at 116-117*. Likewise, Judge Keith: (1) specifically informed Mr. Mancia that, if he pled guilty, *the correct minimum sentence was twenty-five years*;[34] and (2) directly asked Mr. Mancia: "Has anyone said to you, well you know, if you'll plead guilty Judge Keith won't give you more than 25 years, that's the minimum[;]" to which Mr. Mancia responded: "No." *Id. at 116-117, 119*. Finally, before Judge Keith accepted Mr. Mancia's guilty plea, the prosecutor reiterated that Mr. Mancia faced a minimum penalty of twenty-five years in prison and a maximum penalty of life. *Id. at 121*. Thus, *before* he entered his unconditional guilty plea, Mr. Mancia was repeatedly told – by Judge Keith, Mr. Bennett, and the prosecutor – that he faced a *minimum sentence* of twenty-five years imprisonment, up to a *maximum sentence* of life. In response to those statements, Mr. Mancia repeatedly acknowledged that *he understood* the minimum sentence was twenty-five years, up to life, and that *no one* had given him any promises or assurances that the sentence Judge Keith would later impose would be twenty-five years or less.

---

*United States v. Quiroga*, 554 F.3d 1150, 1155 (8th Cir. 2009).

[34] The "Defendant's Statement" *correctly reflected* that the maximum sentence Mr. Mancia faced was "40/life." *Doc. 7-14 at 74*.

Thus, in adjudicating and rejecting this claim, the Arkansas Supreme Court did not unreasonably apply *Strickland* or make an unreasonable determination of the facts in light of the record.

### 3. Mr. Bennett's Erroneous Advice That Mr. Mancia Had A Right To A Direct Appeal Of His Guilty Plea And Sentence (Claim 4)

Mr. Mancia argues that Mr. Bennett was ineffective because he "purposely misinformed and misrepresented" Arkansas law by advising him that he had a right to a direct appeal of his unconditional guilty plea and sentence.[35] *Doc. 1 at 12-13, 35-37*. Mr. Mancia further claims that he "was not told, and he simply had no reason to believe, that by pleading guilty he would not be able to appeal if he were unsatisfied with the sentence imposed on him[,]" and that "at no point did the [trial] court ever tell [him] that *if he pleaded guilty, he would be forfeiting that right*." *Id. at 36* (emphasis in original).

In rejecting this Rule 37 claim, the Arkansas Supreme Court stated the following:

> Mancia asserts that the circuit court's handling of Mancia's plea hearing was confusing and the "explanation process was . . . slick . . . and seemingly designed to elicit a waiver from Mancia without him even knowing he had done so."
>
> * * *
>
> The record demonstrates that the circuit court informed Mancia of his appellate rights:

---

[35] Arkansas law expressly prohibits a direct appeal from an unconditional guilty plea. Ark. R. App. Pro.–Crim. 1(a); *Burns v. State*, 2017 Ark. 280, 3, 528 S.W.3d 269, 270.

The Court: If you're found guilty you have an absolute right in Arkansas to appeal to a higher court; and if you cannot afford the cost of an appeal, then a free appeal will be provided to you.

A free appeal includes a verbatim, word-for-word, account, transcript, of your trial, and a transcript of your trial is necessary to enable you to appeal and they cost money. If you are indigent, can't afford it, then a free transcript would be provided to you to enable you to appeal. Also the assistance of legal counsel would be provided to you to enable you to appeal.

*Now, if you understand these rights, raise your right hand.*

*[Mancia] hand raised.*
....
The Court: *If you've made a decision of your own will to give up these rights and plead guilty, raise your right hand.*

*[Mancia] hand raised.*

(Emphasis added.)

Accordingly, the record demonstrates that Mancia was informed of his appellate rights. Mancia has made conclusory allegations with no factual support, and the record does not support his argument. Therefore, we affirm the circuit court.

*Mancia II*, 459 S.W.3d at 274-75.

Even if Mr. Bennett failed to correctly inform Mr. Mancia that, if he entered an unconditional guilty plea he would lose his right to a direct appeal, the record shows that Mr. Mancia suffered no prejudice. The *trial court* unquestionably advised Mr. Mancia that, if he proceeded to trial and was convicted, he would have the right to a direct appeal, *but*, if he entered a guilty plea, that was one of the rights he would

lose. *Doc. 7-14 at 108*.

Accordingly, the Arkansas Supreme Court's adjudication of this claim did not involve an unreasonable application of *Strickland*, or an unreasonable determination of the facts.

### 4. Mr. Bennett's Alcohol Abuse and Disciplinary History Caused Mr. Mancia To Enter An Unknowing And Involuntary Guilty Plea (Claims 5 and 6)

In Claim 5, Mr. Mancia asserts that his guilty plea was unknowing and involuntary because Mr. Bennett appeared at the plea hearing in an intoxicated and impaired state. *Doc. 1 at 4, 25-27*. Mr. Mancia further claims that he is "more than certain" Mr. Bennett was drunk when he appeared at the county jail at 2:00 a.m. on February 4, 2008, to persuade him to enter a guilty plea at the pretrial hearing scheduled for 8:30 a.m. *that same day*. *Id. at 4*.

In Mr. Mancia's Rule 37 appeal, the Arkansas Supreme Court considered and rejected this claim based on its review of the entire record, including the fifteen-page transcript of the plea hearing: "[T]he record demonstrates that defense counsel acted in an appropriate manner and there is nothing in the record to suggest defense counsel was intoxicated." *Mancia II*, 459 S.W.3d at 265-66. The Arkansas Supreme Court also noted that Mr. Mancia had not come forward with *any supporting facts*, or the names of any witnesses and their anticipated testimony. *Id*. at 266.

Accordingly, it concluded that Mr. Mancia had failed to show that Mr. Bennett had performed deficiently. *Id.*

Factually unsupported allegations of trial counsel's alleged intoxication or history of alcohol abuse are not sufficient to establish an ineffective assistance of counsel claim. *See Fowler v. Parratt*, 682 F.2d 746, 750 (8th Cir. 1982) (finding made in attorney disciplinary proceeding that defense attorney was an alcoholic did not trigger rebuttable presumption that his representation was ineffective). At no point during the state court proceedings did *anyone* raise questions about Mr. Bennett being impaired or under the influence of alcohol. Furthermore, nothing in the transcript of the plea hearing supports Mr. Mancia's factually unsupported allegations that Mr. Bennett was impaired by alcohol, either before or during that proceeding.

Finally, it strains credulity to believe that: (1) Mr. Mancia somehow overlooked the compelling need to inform Judge Keith that Mr. Bennett had been drunk since he visited with him at 2:00 a.m. in the jail *and* he was still drunk at 8:30 a.m.; and (2) Judge Keith and the prosecutor failed to observe any signs of what Mr. Mancia claims was Mr. Bennett's serious alcohol impairment during the plea hearing.

Nothing in the record supports Mr. Mancia's conclusory claim that Mr.

Bennett was impaired by alcohol, both before and during the plea hearing. The Arkansas Supreme Court's rejection of that claim did not involve an unreasonable application of *Strickland*, or an unreasonable determination of the facts in light of the record.

In Claim 6, Mr. Mancia asserts that Mr. Bennett's "history of errors and sanctions" in other cases was the result of his "alcohol problem" and it culminated in his disbarment.[36] *Doc. 1 at 4.* Respondent argues that this claim is procedurally defaulted because Mr. Mancia failed to raise it in his Rule 37 Petition.

The Court concludes that it is more efficient to resolve this claim on the merits and thereby avoid undertaking a lengthy procedural default analysis. *See Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir. 2006) (holding that procedural default is not a jurisdictional bar, and federal courts can address the merits of an apparently defaulted claim "in the interest of judicial economy").

An attorney's history of disciplinary sanctions does not support a presumption of ineffective assistance. *See Ghost Bear v. United States*, 777 F.3d 1008, 1011-12 (8th Cir. 2015) (no *per se* rule of ineffective assistance due to attorney's licensing problems and history of disciplinary sanctions, including disbarment or suspension).

---

[36] None of the many disciplinary sanctions that the Arkansas Committee on Professional Conduct imposed on Mr. Bennett were based on any finding of alcohol use or impairment. *See* footnote 19, *supra.*

While Mr. Bennett has a long history of disciplinary sanctions, none of them arose from his representation of Mr. Mancia at the *trial level*.[37]

Mr. Mancia has not come forward with *any facts* to support his entirely conclusory allegation that Mr. Bennett's alleged "alcohol problem" was responsible for him providing ineffective assistance of counsel. This entirely conclusory allegation of ineffective assistance of counsel, untethered to any facts suggesting Mr. Bennett was impaired by alcohol, cannot pass muster under *Strickland* and fails on the merits because there is *no evidence* it resulted in any prejudice to Mr. Mancia. *Id*. at 1011-12.

## B.    Habeas Claims Waived By Mr. Mancia's Entry Of A Knowing And Voluntary Guilty Plea (Claims 7 – 11)

"When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). *See also Nguyen v. United States*, 114 F.3d 699, 703 (8th Cir.1997) (quoting *Voytik v. United States*, 778 F.2d 1306, 1308 (8th Cir.1985) (A defendant's "representations during the plea-taking carry a strong presumption of verity and pose a 'formidable

---

[37] The only sanction Mr. Bennett received, in connection with his representation of Mr. Mancia, was a three-month suspension, in 2009, for failing to file a timely Appellate Brief in the direct appeal of Mr. Mancia's sentence. *See* footnote 19 *supra*.

barrier in any subsequent collateral proceedings.'")); *Feather v. United States*, 9 F.3d 114, at *1 (8th Cir. 1993) (quoting *Porter v. Lockhart*, 925 F.2d 1107, 1111 (8th Cir. 1991) ("Such '[s]olemn declarations in open court carry a strong presumption of verity.'")). Thus, a habeas petitioner who enters a guilty plea "may only present [ineffective assistance of counsel] claims relating to the plea advice" that resulted in the plea of guilty being involuntary. *See Whitepipe v. Weber*, 536 F. Supp.2d 1070, 1082 (D.S.D. 2007) (omitting citation); *see also Bass v. United States*, 739 F.2d 405, 406 (8th Cir. 1984); *Coleman v. Hobbs*, Case No. 5:10-CV-00248-JMM-JTK, 2012 WL 2870812 (E.D. Ark. June 14, 2012).

Claims 7 through 11 all involve allegations of Mr. Bennett's ineffectiveness that occurred *before* Mr. Mancia entered his knowing, voluntary, and unconditional guilty plea. Accordingly, all of those claims are now waived under *Tollett* and its progeny.

For example, Claim 7 alleges that Mr. Bennett failed to investigate Mr. Mancia's case;[38] Claim 8 alleges Mr. Bennett failed to investigate and challenge E.M.'s statement; and Claim 9 alleges that Mr. Bennett failed to investigate and

---

[38] This conclusory assertion by Mr. Mancia is directly refuted by *his own statements* during the plea colloquy. The trial judge asked Mr. Mancia if he could "think of anything [Mr. Bennett] failed to do that [he] should have done before you stood before the Court to plead guilty?" Mr. Mancia responded, "No, sir." *Doc. 7-14 at 119.*

51

challenge Mr. Mancia's post-*Miranda* interrogation by Sgt. Thompson and Officer Beeler. Likewise, Claim 10 alleges that, during his custodial interrogation, Mr. Mancia was not adequately and effectively advised of his *Miranda* rights. Finally, Claim 11 alleges that Mr. Bennett did not seek to obtain a plea agreement from the State, for a lesser sentence, *prior* to his entry of an unconditional guilty plea.[39]

Mr. Mancia knowingly and voluntarily entered an unconditional guilty plea. Before he did so, Judge Keith explained to him that:

> This is a plea bargain to the Court; that is you don't have a plea bargain with the State . . . the Court can impose

---

[39] During the plea colloquy, *the trial court* made it clear to Mr. Mancia that he was entering an *unconditional plea*, without a plea agreement. *Doc. 7-14 at 116*. Nevertheless, Mr. Mancia makes the speculative argument that, because the prosecutor stated, during the sentencing hearing, that forty years was "a good place to start" in deciding the appropriate sentence, this somehow meant the prosecutor was willing to offer Mr. Mancia a forty-year plea deal. *Id. at 145*. In fact, during the sentencing, the prosecutor argued that Mr. Mancia was a *sexual predator* who would rape another child if he was ever released from prison:

> Does Mr. Mancia deserve life? Maybe. He's given [E.M.] a life sentence.
>
> * * *
>
> To him his daughter was coming on to him. She was flirting with him to try to get out of doing some homework. . . . This is the perspective of a pedophile. The Court can lock him up for three life times, Your Honor, and he's not going to change. He is what he is. And while 40 years may not seem like [] enough, it's a good place to start.

*Id. at 144-145*.

Thus, *viewed in context*, the prosecutor was arguing for a *minimum sentence* of forty years, up to what the prosecutor believed was the appropriate sentence – *life*.

The prosecutor's argument clearly resonated with Judge Keith, who gave Mr. Mancia a life sentence: "[Y]ou gave this child a life sentence[,] . . . [t]oday I'm giving you a life sentence." *Id. at 150*.

> whatever penalty within the statutory limits that the Court
> feels is appropriate in your case . . . the Court can sentence
> you to 25 years or – or more, up to the maximum[.]

*Doc. 7-14 at 116-117*. Thus, as a matter of law, Mr. Mancia waived the ineffective assistance of counsel claims against Mr. Bennett that he is now asserting in Claims 7 through 11.

### C.    Mr. Mancia's Procedurally Defaulted Habeas Claim (Claim 12)

Mr. Mancia alleges that, without his knowledge and consent, Mr. Bennett contacted Mr. Mancia's family about a direct appeal immediately after his "trial." *Doc. 12 at 4-5*. Because there was *no trial*, the Court assumes Mr. Bennett's alleged misconduct took place immediately after Mr. Mancia's sentencing.

According to Mr. Mancia, Mr. Bennett made "outrageous promises" about "getting [Mr. Mancia] a new trial[,]" and demanded that Mr. Mancia's family make additional payments to him to handle the appeal. *Id.* He further alleges that Mr. Bennett missed the filing deadline for the Appellate Brief in the direct appeal of his sentencing, and then ultimately filed a no-merit Appellate Brief, which "deliberately defrauded" Mr. Mancia of his opportunity to raise valid claims, such as his coerced-confession claim.[40] *Id.*

---

[40] Under the Arkansas Rules of Criminal Procedure, after Mr. Mancia entered his unconditional guilty plea, he relinquished his right to a direct appeal. Ark. R. App. P. Crim. 1(a). Furthermore, while Mr. Bennett's alleged misconduct, as described in Claim 12, may have supported a referral to the Arkansas Committee on Professional Conduct, it cannot support a

A petitioner must "fairly present" his habeas claims in state court before seeking § 2254 relief. *Murphy v. King*, 652 F.3d 845, 858-49 (8th Cir. 2011); 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus ... shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State."); *Palmer v. Clarke*, 408 F.3d 423, 430 (8th Cir. 2005) (a habeas petitioner has "fairly presented" a claim when he has "properly raised the same factual grounds and legal theories in the state courts which he is attempting to raise in his federal habeas petition."). This means a habeas petitioner must give the state a final "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995). If the petitioner fails to do so, a federal court is precluded from considering the unexhausted claim under the well-established doctrine of procedural default. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).

When a procedural default occurs, federal habeas review of the claim is barred unless the prisoner can demonstrate "cause" for the default and "actual prejudice," or demonstrate that failure to consider his claim will result in a "fundamental miscarriage of justice." *Id*. at 750. Here, Mr. Mancia's Rule 37 Petition alleged that Mr. Bennett provided ineffective assistance of counsel because he "fail[ed] to inform

---

habeas claim, under § 2254, because it does not rise to the level of a constitutional violation.

Defendant that he would not have a right to appeal from a guilty plea absent some error in the sentencing proceeding[,] ... [and] [Mr. Bennett] filed an appeal ... [but then] filed a no-merit brief." *Doc. 7-8 at 4*. These allegations only fairly raised the claim that Mr. Bennett was constitutionally ineffective for not informing Mr. Mancia that, if he entered a guilty plea, he would waive his right to a direct appeal.[41]

In contrast, Mr. Mancia's Rule 37 Petition makes only a passing reference to Mr. Bennett filing a "no merit" Appellate Brief, *without any further explanation or analysis of that claim*. This indefinite and conclusory assertion does not explain *how* and *why* this constituted ineffective assistance of counsel and falls woefully short of what was necessary in order to place the Arkansas Supreme Court on notice that Mr. Mancia was claiming Mr. Bennett's decision to file a "no merit" brief constituted a separate, stand-alone ineffective assistance of counsel claim.[42] This undoubtedly explains why the Arkansas Supreme Court did not address this issue in affirming the trial court's denial of Rule 37 relief.

The only *cause* Mr. Mancia offers to excuse his procedural default of Claim 12 is that he received ineffective assistance of counsel from Ms. Reece, the attorney

---

[41] The Court has previously analyzed and rejected this claim, on the merits, in Section II(A)(3) of this decision, at pages 45-47.

[42] Filing an *Anders* "no merit" Appellate Brief may or may not support an ineffective assistance of counsel claim, depending on the specific facts of the case and whether the defendant had any meritorious appellate claims.

who represented him in the Rule 37 proceeding. *Doc. 10 at 3*. He argues that, under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), the Court should use the narrow equitable exception created by those cases and reach the merits of this claim.

In *Martinez* and *Trevino*, the Court recognized that, in a narrow range of habeas cases, a petitioner can rely on his lack of counsel or ineffective assistance of counsel, which occurred at the initial step of post-conviction review, to establish "cause" to excuse his procedural default of an ineffective-assistance-of-counsel claim. However, the "*Martinez* exception" applies only to defaulted claims of *ineffective assistance* of *trial counsel*. In *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017), the Court held that *Martinez* "provides no support for extending its narrow exception to new categories of procedurally defaulted claims" that arise from *appellate* counsel. *Accord: Dansby v. Hobbs*, 766 F.3d 809, 832-34 (8th Cir. 2014) (declining to extend *Martinez* to reach any other claims of trial error other than ineffective assistance of *trial* counsel claims).

In Claim 12, Mr. Mancia alleges Mr. Bennett provided ineffective assistance of counsel in handling his *direct appeal* of his sentence and that Ms. Reece provided ineffective assistance of counsel in handling his *Rule 37 proceedings*. Because the *Martinez* exception only applies to ineffective assistance of *trial counsel*, it cannot

be used as a basis for excusing Mr. Mancia's procedural default of the newly raised claim that Mr. Bennett, *acting as appellate counsel*, provided ineffective assistance.[43]  Accordingly, Claim 12 is procedurally defaulted.

**D.   Mr. Mancia's Habeas Claims That Are Not Cognizable Under § 2254 (Claims 13 – 16)**

### 1. Ms. Reece Provided Ineffective Assistance Of Counsel In Representing Mr. Mancia In The Rule 37 Proceedings (Claims 13 –15)

Mr. Mancia argues that Ms. Reece provided ineffective assistance of counsel in the Rule 37 proceedings. According to Mr. Mancia, she failed to utilize the full ten-page limit to convey the essential facts supporting his Rule 37 claims;[44] missed deadlines associated with the Rule 37 appeal; and filed a deficient Appellate Brief with the Arkansas Supreme Court. *Doc. 1 at 19-23*. Finally, he contends that, during the Rule 37 proceeding, Ms. Reece was suspended from practicing before the Arkansas Supreme Court, thereby forcing him to hire a new lawyer, Mr. Lambert, to handle his Rule 37 appeal. *Id. at 20*.

---

[43]  Additionally, because Mr. Mancia entered a knowing and voluntary guilty plea, his belated assertion that "I did not rape my step-daughter" cannot support an actual innocence claim, much less provide a basis for claiming it resulted in a "fundamental miscarriage of justice." *See Weeks v. Bowersox*, 119 F.3d 1342, 1352 (8th Cir. 1997) ("Allowing a waiver of a state procedural default based on mere allegations of actual innocence is . . . contrary to the [new reliable evidence requirement] . . . [and] also runs counter to the spirit and purpose of the actual innocence gateway.").

[44]  Mr. Mancia asserts that Ms. Reece placed all eight of his Rule 37 claims on one and one-half pages, without any supporting facts. *Doc. 1 at 19-23*.

The law is clear that, in a state post-conviction proceeding, a petitioner does not have a constitutional right to an attorney. *Martinez*, 132 S. Ct. at 1315, 1319-20; *Coleman*, 501 U.S. at 752. Where no right to counsel exists, there can be no freestanding claim of ineffective assistance of counsel. *Simpson v. Norris*, 490 F.3d 1029, 1033 (8th Cir. 2007). For that reason, 28 U.S.C. § 2254(i) makes it clear that: "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."

Accordingly, all of Mr. Mancia's freestanding ineffective assistance of counsel claims against Ms. Reece, for the legal representation she provided him in the Rule 37 proceedings, are without merit.

## 2. The Trial Court's Failure To Conduct An Evidentiary Hearing On The Claims Raised In Mr. Mancia's Rule 37 Petition (Claim 16)

Mr. Mancia argues that the trial court erred in failing to conduct an evidentiary hearing on the claims he asserted in his Rule 37 Petition. *Doc. 1 at 23, 29*. According to Mr. Mancia, the serious nature of the allegations in his Rule 37 Petition *required* the trial court to conduct an evidentiary hearing before deciding the merits of those claims. Respondent argues that, because Claim 16 does not raise a question of federal law, it is not cognizable in a § 2254 action. The Court agrees.

In rejecting Mr. Mancia's Rule 37 claims, without conducting an evidentiary

hearing, the trial court relied on *state law*, which explicitly authorizes Rule 37 claims to be resolved, without conducting an evidentiary hearing, if the files and record of the case conclusively show that the prisoner is entitled to no relief. See Ark. R. Crim. P. 37.3(a) (2011). In *Henington v. State*, 2012 Ark. 181, at 5-6, 403 S.W.3d 55, 59-60, the Court held that Rule 37.3(a) vests the trial court with discretion to decide whether the files and records are sufficient to sustain the court's findings, *without a hearing*. Finally, in *Nance v. State*, 339 Ark. 192, 4 S.W.3d 501(1999), the Arkansas Supreme Court held that conclusory allegations in a Rule 37 Petition, which are unsupported by facts, do not provide a basis for either an evidentiary hearing or post-conviction relief.

The Eighth Circuit has repeatedly recognized that a § 2254 habeas action is not the appropriate procedural vehicle to challenge an alleged error of state law that occurred during a state post-conviction proceeding. *See Pate v. Norris*, No. 4:05cv00491-GH, 2007 WL 990698, at *24 (E.D.Ark. March 29, 2007) (citing *Williams v. State of Missouri*, 640 F.2d 140, 143 (8th Cir. 1981); *Mitchell v. Wyrick*, 727 F.2d 773, 774 (8th Cir. 1984); *Smith v. Lockhart*, 882 F.2d 331, 334-335 (8th Cir. 1989); and *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986)).

Accordingly, because Claim 16 alleges only that the trial court committed an error under state law, it is not cognizable under § 2254.

**E.   Mr. Mancia's Request For This Court To Conduct An Evidentiary Hearing (Claim 17)**

Finally, Mr. Mancia argues that this Court must conduct an evidentiary hearing on his habeas claims. However, as the Supreme Court has explained, a federal habeas court is not required to hold an evidentiary hearing "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474-475 (2007). *See* Rule 8 of the Rules Governing § 2254 cases.

After carefully reviewing the entire state court record, the Court concludes that it fully refutes the factual allegations supporting Mr. Mancia's habeas claims. Accordingly, his request for an evidentiary hearing is denied.

### III. Conclusion

IT IS THEREFORE ORDERED that this 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus, *Doc. 1 as amended by Doc. 12*, is DENIED and this case is DISMISSED, WITH PREJUDICE.

IT IS FURTHER ORDERED THAT a Certificate of Appealability is DENIED. *See* 28 U.S.C. § 2253(c)(1)-(2); Rule 11(a), Rules Governing § 2254 Cases in United States District Courts.

DATED THIS 24ᵗʰ day of October, 2018.

_____
UNITED STATES MAGISTRATE JUDGE